(78 South. 389)

PROFILE COTTON MILLS v. CALHOUN WATER CO. (7 Div. 882.)

(Supreme Court of Alabama. Nov. 29, 1917. Rehearing Denied April 4, 1918.)

Appeal from Circuit Court, Calhoun County; Hugh D. Merrill, Judge.

Original bill in equity by the Profile Cotton Mills against the Calhoun Water Company. Decree for defendant dismissing the suit and complainant appeals. Affirmed.

This controversy concerns the use of certain portions of a 10-acre tract of land in the city of Jacksonville, Ala., known as the Jack Fish alley tract, the legal title to which stood in George P. Ide until it was sold by his trustee in bankruptcy to one Wellborn who subsequently conveyed the same to the Calhoun Water Company, respondent in this case. The respondent removed the pipes of the appellant from its lands, and appellant obtained a temporary restraining order, forbidding interference by respondent of the use of these pipes,

which said order was granted without notice to the appellee. Upon the hearing of the motion to dissolve the temporary restraining order, and the appellant's motion to grant an injunction pendente lite, the judge of the city court dissolved the temporary restraining order and denied the temporary injunction. From this decree the appellant prosecuted an appeal to this court. The decree of the court below was affirmed, both on the original submission and application for rehearing. Profile Cotton Mills Co. v. Calhoun Water Co., 189 Ala. 181, 66 South. 50. Appellant then proceeded to bring the cause on for final hearing.

The pleadings, as originally appeared on former appeal, are fully set forth in the statement of the case reported in 189 Ala. 181, 66 South. 50, supra.

Before submission of the cause for final decree, the original bill was amended by the addition of three paragraphs, viz. 24, 25, and 26. The amendment emphasizes the former allegations of the bill as to said Ide being the confidential agent and manager of the company, intrusted with full power and authority to locate, erect, and put in operation the mill and arrange for a proper water supply, that Ide without notice to the complainant installed the waterworks on and through said 10-acre lot, to which he held the legal title, and that complainant was not aware of that situation until the year 1911, except such constructive notice as it acquired by the titles to the property on record in the probate office. The complainant supposed and acted on the idea that Ide had acquired the water rights in a permanent and proper way; while, in fact, Ide, acting as its agent and also for himself in the transaction, induced the complainant to go upon said land and erect said waterworks improvements at its expense, upon the just expectation on complainant's part, raised by said Ide, that complainant would never be disturbed by Ide or his legal title, or any one claiming under him, and that Ide by his acts and conduct knowingly raised this expectation on complainant's part; that, in fact, Ide himself intended at the time that complainant should never be disturbed in the use and possession of said property; and that if he reserved any right in the future to revoke complainant's right to use said property, he kept the intention a secret in his own mind. Complainant's entry upon the land and improvements of and use of the same was upon the assumption, basis, and just expectation—all raised knowingly by Ide—that the occupation was for an indefinite period, and never to be disturbed, and, further, that the said Ide and those claiming through him are estopped in equity to claim any adverse interest against complainant's right to use said water supply in perpetuity.

The twenty-fifth paragraph reiterates the averments, by reference to them, as contained in the twenty-fourth paragraph, and avers that by virtue of his confidential relation Ide had extended to the complainant the right to retain the property at its actual cost to him, which cost the complainant is willing and offers to pay, if it is held that the complainant is not entitled thereto without such tender and offer.

In the twenty-sixth paragraph it is averred that the said Ide, owning the said 10-acre lot and being complainant's agent to secure a water supply, in the discharge of his said duties, installed the complainant in the possession and use of said property, under the understanding and agreement, between himself as owner and himself as complainant's agent, that he would convey said property to complainant at most at the cost to him, or the value at that date, and in part performance of such agreement delivered possession to complainant, and induced it to erect its waterworks thereon; that complainant had no notice that Ide had not paid himself out of its money which he controlled, and complainant avers that he did pay himself out of said money, but, if mistaken in this, offer is made to pay the same.

The prayer of the bill, as amended, is that the court decree that complainant is entitled, and has the right in perpetuity to the possession, use, and ownership of said 10-acre tract and the water privileges thereon, or, if not entitled to the fee-simple title to said property, that it be decreed that it is entitled to an easement in perpetuity to the water privileges on said property for its said mills and factory, village, etc.; that respondent and those claiming under it be perpetually enjoined from in any manner interfering with the possession and use of said property; and, further, that respondent be required to execute and deliver to the register of this court for complainant a proper deed, conveying by quitclaim all right and interest in the property and easement decreed to complainant. The prayer also contains an offer to do equity.

The respondent in answer to the amendment refiled and adopted the answer to the bill already on file, and set out in substance in the statement of the case in 189 Ala. 181, 66 South. 50. The answer further specifically answers paragraphs 24, 25, and 26, denying that said Ide was intrusted with full power and authority to locate, erect, and put in operation complainant's mills, but that he was simply one of a number of directors or officers intrusted with that duty, and that as a matter of fact the location of said mill was not determined by said Ide, but by joint action of the board of directors of the Alabama Investment Company and the board of directors of the Ide Cotton Mills. The Alabama Investment Company having donated 40 acres of land for this purpose, the said two boards met and conferred together and selected the present site. The answer further denies that said site selected was selected with reference to any use to be made of the lands belonging to Ide, but, on the contrary, there was at that time no expectation on the part of any one that any use would be made of the lands of said Ide by said cotton mill. That the two streams known as Big Spring branch and Williams branch united below the lands of said Ide, and, totally independent thereof, watered the tract so donated by the said investment company; the said combined branches constituting an ample and sufficient source of supply for the boilers and other manufacturing uses of said cotton mills. That, as a matter of fact, the first mill was built and its boiler and manufacturing water taken altogether from the stream below the lands of Ide, and without making the slightest use of Ide's lands. At the time said tract of land was donated, it was the intention of the directors of the Ide Cotton Mills to erect only 20 cottages for employés, which was done. The public water company supplying the inhabitants of the city of Jacksonville was anxious to supply drinking water for these 20 operatives' houses, and such was the original intention of the directors. However, after the first mill was built, the superintendent conceived the idea of laying a pipe in the Big Spring owned by the city, and bringing said pipe over the lands of Ide on the lands of the mill, and thereby supplying cool water for drinking purposes to the houses of the operatives, at an inconsiderable expense, by means of building a brick shanty on the lands of said Ide and placing a small pump thereon. The said superintendent, Robbins, and Vice President Hawke, who were men of practical ability and experience in such matters, decided upon that course, and said Ide agreed to extend the courtesy of permitting the gratuitous use of his lands for such purposes. The total cost for such purposes, and the installation of said pipes, was not exceeding $200, which has been saved over and over again by the reduced cost of obtaining the water in that manner. That none of said investigations and decisions

as to obtaining drinking water were made and considered until long after the site had been chosen by joint action of the boards, and the land donated by deed. In the year 1907, when mill No. 2 was built, the question of drinking water was again considered, and the matter taken up with the public water company, but the representatives of the complainant again decided it would be better to obtain the water across the lands of Ide, by pumping the same, and this was accordingly done.

The answer further avers that no use whatever was made of the lands of Ide for boiler water for mill No. 1, and when mill No. 2 was decided upon there was no intention to make use of his lands at that time. At a later date, however, it was discovered—not by Ide, but by the practical representatives of the mill—that it would be a gain in service and economy to place the pipes of said mill a little higher than they had been placed in the case of mill No. 1, so that the water could be taken from the stream on the lands of Ide, and that by this method sufficient water for both mills would flow by gravity. Had the mill taken its water into its pipes below the lands of said Ide, pumping would have been necessary to supply sufficient water for mill No. 2. Upon being requested to do so by said officers, Ide granted permission to the complainant to place its pipes upon his land, procuring the water in the manner above described.

The total expenditure on account of water for boiler purposes from the land of Ide amounted to $2 or $3 for terra cotta piping, and about $100 for a small dam. That while it is true approximately $20,000 had been spent on the waterworks system of said mill, yet of that sum not $500 was spent in equipping said mill to make use of the lands of Ide. Practically the whole of the expenditure was in the system of pipes to carry the water to the houses, and in the reservoir and other water equipment upon the lands of the complainant to conduct the water into its boilers. Had there been no intention to use the lands of Ide, and had said lands not been used at all, much of said money would have been spent in any event and the same equipment installed, with the exception of said $500. And that it had always been entirely practical to operate said mill by taking its boiler water from a source on its lands, at a pumping charge of about $5,000 per year, which is no greater than the ordinary pumping charge spent by mills of the size and character of this. That it is entirely practical to obtain a sufficient and proper supply of water for the operatives' houses connected with said mills at a reasonable cost from the public water company in the city of Jacksonville.

Respondent further states that complainant has not only lost nothing by the use of the Ide land, but, on the contrary, using the said land free of charge has been of great profit to it, in the saving of extra pumping expense, and that in fact, if complainant had only had one month's use of the land, the full cost of said expenditure would have been saved to it.

The answer further denies that there was no notice to complainant that the dam and pumping station were built on Ide's land, but, on the contrary, that the officers and representatives of the complainant, acting within the line and scope of their authority, and the said corporation itself, had full notice thereof through its directors and through numerous persons representing it and in no wise connected with the said Ide. It is further averred that the land of said Ide was not improved or benefited by said improvement. It is also denied that Ide, acting both for himself individually and for the mill in his representative capacity, entered into a contract, impliedly, constructively, or in any other manner, to convey his property to the complainant upon the payment of the original cost thereof; but, on the contrary, offers to sell

were expressly made on the part of Ide and rejected by said company on several occasions. That said Ide made said offer to sell to one Hawke who was vice president and a salaried officer of the company, and also to the directors, which offer was declined.

The answer contains general denials of any estoppel, or that complainant has paid one cent in the reliance upon a permanent easement, occupancy or right of user in its lands. It denies that complainant has in any way altered its position prejudicially on the expectation of a permanent user of the lands, and that in fact, instead of being prejudiced by the arrangement heretofore made, complainant gained a huge profit out of said arrangement. The answer also contains pleas A and B, which set up, as against the decree of any permanent interest in the lands, the statute of frauds.

Testimony was taken, and upon submission of the cause for final decree upon pleadings and proof,· the court below denied the relief sought by appellant and dismissed the bill. From this decree the appellant prosecutes this appeal.

W. A. Gunter, of Montgomery, and J. F. Matthews, of Anniston, for appellant. Knox, Acker, Dixon & Sterne, of Anniston, for appellee.

GARDNER, J. The foregoing statement of the case, in connection with the report of the cause on former appeal (Profile Cotton Mills Co. v. Calhoun Water Co., 189 Ala. 181, 66 South. 50), sufficiently discloses the nature of the suit and the issues presented for determination. Upon the former appeal this court determined, after due consideration, that the proof offered by way of affidavits did not entitle complainant to an injunction pendente lite, and sustained the lower court in the denial of the same.

An examination of the evidence upon this appeal discloses that it is not materially variant from that contained in the former record—there being only some slight omissions and additions. The additional proof of any consequence, to our minds, in the present record relates to the ordinance of the city of Jacksonville granting certain rights as to the spring, but which, in our opinion, is satisfactorily explained by the witness George P. Ide.

We do not therefore deem it necessary to enter into an argumentative analysis of the evidence, as a discussion of the same would serve no useful purpose. The conclusion of facts which we have reached would result in a denial of relief to the complainant upon the principle upon which the equity of the bill was rested in the opinion on the former appeal, as well as, also, upon any principle insisted upon by counsel for appellant in his brief as rested upon the last amendment to the bill. Such being the case, no necessity arises for the discussion of any legal principles. The evidence on this appeal has been given careful consideration, and we will here state our conclusion as to the facts presented in a summary manner, omitting a discussion of the evidence; which is in accord with the present policy in dealing with questions of fact. Acts 1915, pp. 594, 595, § 3.

We are reasonably satisfied from the proof that the purchase of the tract of land here in controversy by George P. Ide, whose title the appellee acquired, was without reference to the location of complainant's predecessor, the Ide Cotton Mills, and that at the time mill No. 1 was constructed this tract of land, known as the Jack Fish alley tract, was not at all essential to the operation of said mill. In fact the water used strictly for mill purposes was procured entirely independently of this tract of land. That at that time there were only a small number of operatives' houses, and we are of the opinion the fact that some of the piping conveying the spring water to these houses was

placed upon this tract of land, with Ide's consent, is not a matter which should have any material bearing, as this water supply at that time was not considered a matter of very great concern, as the public waterworks company was offering to supply the water therefor.

We are further convinced that, when mill No. 2 was constructed, and it was determined by the superintendent and vice president of the mills, both of whom were men of considerable experience in the cotton mill business, and by the said Ide, to build the dam together with the pumping station, and lay additional piping upon this tract of land so as to obtain sufficient supply of water by gravity, rather than by the more expensive method of pumping, there was no intention on the part of Ide in granting permission for this purpose to vest in the complainant any permanent easement thereto, or to in any manner divest himself of the fee-simple title to the property. Nor was such the intention, in our opinion, of any of the parties concerned therein; nor do we think that complainant's entry upon the land was, to use the language of the bill as amended, "upon the assumption, basis, or just expectation—all raised knowingly by Ide—that the occupation was for an indefinite period, and never to be disturbed."

The agreed statement of facts discloses that the said Ide offered to the vice president and to a number of the directors to sell this tract of land to the complainant at its cost price, or its reasonable market value, and that the offer was declined. It further appears from the evidence of one of the directors, that he himself brought the matter to the attention of other directors, and suggested its purchase by the company, but the suggestion did not meet with favor. This witness, testifying as to this particular matter, said: "I have resided in Jacksonville, Ala., since 1872. I was one of the original stockholders of the Ide Cotton Mills, and was a director from its incorporation until the year 1911. I knew all along that Mr. Ide personally owned the tract which is in controversy in this suit, known as the Jack Fish alley tract. Several times I recommended to members of the board that the company buy the site from him, and he always expressed a willingness to sell at a fair valuation. I am unable to state whether or not these conversations were had during meetings of the board or to members of the board not assembled in meeting. I do not know of any record being made upon the minutes of any such recommendations or offers."

The evidence for the respondent tends strongly to show that the complainant made no claim to any permanent easement or right to the use of this tract of land for these purposes until the matter of this litigation arose. While it may appear that some of the large stockholders who were nonresidents (the Henrys particularly) might not have been informed in regard to the exact status of the water supply, yet we are convinced that the company had full notice thereof through the superintendent, vice president, and the members of the board of directors to whom the matter was mentioned.

We are further convinced that, although a considerable sum of money was expended in procuring the water supply, yet, as a matter of fact, we conclude that only a small amount thereof, not exceeding a few hundred dollars, was expended on the lands here in controversy, which would not otherwise have been spent, and that this small sum was of little consequence in comparison with the considerable benefit derived by the company in procuring the water in this manner. We are also persuaded that the complainant is in no manner dependent upon this tract of land for its water supply, but that of course, to procure it in another manner would entail more expense, which, however, we think the proof shows would not be

in excess of what is usually borne by cotton mills of this size. That notwithstanding the necessity of the change, and the expense incident thereto, we are of the opinion that, even taking this into consideration, the arrangement whereby the complainant made use of this tract of land for these purposes has proven profitable to the company. While the evidence may fail to disclose that this matter was brought formally before a meeting of the board of directors, witnesses being uncertain as to that, and there being no record evidence thereof, yet it clearly appears that it was brought to the attention of members of the board by one of the members thereof, and also by Ide, as well as to the superintendent and vice president who were experienced in the business, and who seem to have been largely instrumental in having the water supply arranged in its present manner.

We do not find from this evidence that Ide has been guilty of any fraud, misrepresentations, or concealment of facts; nor has he misled the company either by word or conduct. If it was unwise to have the water supply provided in the present manner, which of course is not conceded as above indicated, it was, in our opinion, merely an error of judgment, which would confer upon complainant no right to relief by this bill. We concur, in conclusion, with the following comment found in the opinion of the judge of the city court on the former appeal in this cause, wherein it was said: "It is but fair to say, however, that there is no reasonable ground for believing that Ide was actuated by other than proper motives in his dealings. He, of course, did not foresee a relation of antagonism between himself and the mill. The mill's success or failure meant his success or failure, as he must have understood always. Subsequent results cannot convert that into fraud which was not fraud in the beginning."

Holding as we do to the foregoing views upon the questions of fact presented, it results that we are in accord with the conclusion of the court below in denying the relief and dismissing the bill. The decree will be accordingly affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and SAYRE, JJ., concur.